IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

GLENDA SEARS                            )
    Administratrix of the Estate       )
    of Harold Thomas Hobby[1]          )
                                       )
v.                                      )          No. 1:11-0096
                                       )
CAROLYN W. COLVIN,                      )
    Acting Commissioner of             )
    Social Security[2]                 )

To: The Honorable John T. Nixon, Senior District Judge

## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"), as provided by the Social Security Act.

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff was not disabled under the Act is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 15) should be DENIED.

---

[1] Mr. Hobby died on January 16, 2012, and the administratrix of his estate was substituted as the plaintiff in this suit. Docket Entry Nos. 11, 14. For the sake of convenience, the Court will continue to refer to Mr. Hobby as "the plaintiff."

[2] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for former Commissioner Michael J. Astrue as the defendant in this suit.

# I. INTRODUCTION

On October 25, 2007, the plaintiff protectively filed applications for SSI and DIB, alleging a disability onset date of August 2, 2006.  (Tr. 25, 159-66, 172.)  His applications were denied initially and upon reconsideration.  (Tr. 70-84.)  On July 21, 2010, he appeared and testified at a hearing before Administrative Law Judge William B. Churchill ("ALJ").  (Tr. 39-69.)  The ALJ entered an unfavorable decision on August 25, 2010.  (Tr. 25-34.)  On September 22, 2011, the Appeals Council denied the plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-4.)

# II. BACKGROUND

The plaintiff was born on June 8, 1965, and he was 41 years old as of his alleged disability onset date.  (Tr. 172.)  He attended school through the seventh grade and worked as a farm worker, farm mechanic, auto salvager, and construction worker.  (Tr. 43-45, 63.)

## A.  Chronological Background:  Procedural Developments and Medical Records

On July 14, 1996, an x-ray of the plaintiff's cervical spine was normal.  (Tr. 273.)  The record contains no intervening medical evidence until July 24, 2007, when the plaintiff presented to the Maury Regional Hospital emergency room with chest pain.  (Tr. 276-82, 286-309.)  He complained of intermittent chest pain, and the emergency room physician diagnosed acute coronary syndrome, hypertension, and hyperglycemia.  (Tr. 276-77.)  He was admitted to the hospital and examined by Dr. Daniel Skarzynski, who observed that the plaintiff offered conflicting reports, at times describing his pain as "episodic" and occurring over the previous 24 hours and at other times describing it as

"constant," "persistent," and occurring over the previous week. (Tr. 303-04.) Dr. Skarzynski also observed that the plaintiff had been "asymptomatic overnight" and was not currently experiencing chest pain. (Tr. 304.) A chest x-ray was normal (tr. 309), and a stress echocardiogram, while showing no angina and "no ischemia at the workload achieved," was stopped prematurely due to lower extremity claudication.[3] (Tr. 308, 326.)

The plaintiff presented to Dr. Kevin Maquiling, a cardiologist, for an evaluation of his claudication symptoms on August 7, 2007. (Tr. 324.) A bilateral lower extremity arterial scan performed on August 14, 2007, showed "no significant . . . arterial disease involving either the right or left lower extremity arterial systems." (Tr. 310.) A September 14, 2007 chest x-ray showed "[n]o acute cardiopulmonary pathology" (tr. 315), and a cardiac catheterization the same day showed normal coronary arteries and normal left ventricular function but also showed "elevated left ventricular end diastolic pressure consistent with hypertensive heart disease." (Tr. 313, 325.) Dr. Maquiling noted that "[t]hese findings raise concerns for a nonvascular cause of his symptom pattern such as COPD for the dyspnea and spinal stenosis for the leg pains." *Id.*

The plaintiff presented to Dr. Frances Berry-Brown on five occasions between September and November 2007, during which time he was treated for a variety of ailments, including COPD, chest pain, shortness of breath, hypertension, anxiety, low back pain, leg pain, and hyperlipidemia. (Tr. 331-44.) Physical and neurological examinations were essentially normal with normal range of motion of the spine and extremities, no clubbing or edema, pulses 2+ bilaterally, normal gait, and no gross neurologic abnormalities. (Tr. 334, 337, 340, 343.)

---

[3] Claudication is "limping or lameness." Dorland's Illustrated Medical Dictionary 373 (30th ed. 2003).

The plaintiff also continued to follow up with Dr. Maquiling through October and November 2007. (Tr. 318-21.) Dr. Maquiling prescribed Atenolol for high blood pressure and Advair for COPD. (Tr. 318, 320, 322.) On October 16, 2007, Dr. Maquiling wrote a letter to Dr. Berry-Brown indicating that there was "no sign of obstructive coronary artery disease and no sign of significant peripheral vascular disease within the iliac or proximal portions of the superficial femoral arteries." (Tr. 320.) On November 20, 2007, he wrote to Dr. Berry-Brown that the plaintiff was "doing well" on Atenolol and that he did not recommend any further cardiovascular workup. (Tr. 318.)

On December 13, 2007, the plaintiff presented to Dr. Everette Howell, Jr., a neurosurgeon, with back and neck pain that he reported had been ongoing for ten years. (Tr. 346-47.) During a physical examination, the plaintiff demonstrated "[m]arked limitation in range of motion of the neck" and "[d]iminished range of motion of the back" as well as difficulty walking on his heels or toes, hypoactive ankle jerks, and sensory loss in his hands. (Tr. 347.) Dr. Howell diagnosed lumbar and cervical stenosis and ordered x-rays. *Id.* The cervical spine x-ray showed "[m]inimal anterior cervical spondylosis" and "[n]o abnormal motion with flexion or extension." (Tr. 353.) The lumbar spine x-ray showed normal vertebral height and alignment, normal disc spaces, and "[n]o abnormal motion with flexion or extension," but "[l]imited excursion with both flexion and extension." (Tr. 354.) On December 17, 2007, Dr. Howell observed that the x-rays showed "decreased range of motion of his back and minimal anterior cervical spondylosis." (Tr. 355.)

In a letter to Dr. Berry-Brown on December 19, 2007, Dr. Howell indicated that the plaintiff had "significant lumbar and cervical stenosis and . . . persistent and chronic pain as a result of that." (Tr. 356.) He did not recommend surgery but opined that the plaintiff's "ability to work [was]

certainly limited by his pain," that he had "significant back and leg pain" and that he "would not be able to do so [*sic*] type of moderate to heavy activity." *Id.*

The plaintiff presented to Dr. Berry-Brown on three occasions in January and February 2008 for follow-ups and medication refills. (Tr. 385-90.) During this time, Dr. Berry-Brown diagnosed cervical arthritis, thoracic arthritis, COPD, hypertension, leg pain, and low back pain, and she adjusted his medications to treat these ailments. (Tr. 386-90.) Physical and neurological examinations continued to be essentially normal with normal range of motion, no clubbing, no edema, normal gait, and no gross neurologic abnormalities. (Tr. 386, 390.) On one occasion, Dr. Berry-Brown observed some soft tissue swelling in the thoracic spinal area. (Tr. 386.)

On January 21, 2008, Dr. Horace Edwards, Ph.D., a Tennessee Disability Determination Services ("DDS") nonexamining psychological consultant, completed a Psychiatric Review Technique ("PRT"). (Tr. 360-73.) Dr. Edwards found that the plaintiff had an anxiety disorder, not otherwise specified ("NOS"), but that the impairment was not severe. (Tr. 360, 365.) He opined that the plaintiff experienced mild restriction of activities of daily living, mild difficulties maintaining social functioning, mild difficulties maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. 370.) Dr. Edwards opined that the plaintiff was credible but that he had "no significant functional limitations" and "intact" social skills. (Tr. 372.)

On January 30, 2008, Dr. Alan Cohen, a nonexamining DDS consultative physician, completed a physical RFC assessment. (Tr. 374-81.) Dr. Cohen opined that the plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk at least two hours in an eight-hour workday; and sit about six hours in an eight-hour workday. (Tr. 375.) Dr. Cohen found the plaintiff's complaints of pain in his back, neck, and bilateral lower extremities

credible and opined that he had a limited ability to push and/or pull with his lower extremities; could never climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs, balance, and stoop; and could frequently kneel, crouch, and crawl. (Tr. 375-76, 381.) Dr. Cohen also opined that the plaintiff should avoid concentrated exposure to hazards, such as machinery and heights, as well as fumes, odors, dusts, gases, and poor ventilation. (Tr. 378.)

On May 23, 2008, Susan Warner,[4] a DDS nonexamining medical consultant, completed a physical RFC assessment (tr. 392-97), opining that the plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; and push and/or pull without limitations. (Tr. 393.) She opined that he could never climb ladders, ropes, or scaffolds but could frequently perform other postural activities such as climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. (Tr. 394.) She also opined that he should avoid concentrated exposure to fumes, odors, gases, and poor ventilation. (Tr. 395.)

On May 29, 2008, Dr. Karen Lawrence, Ph.D., a DDS nonexamining psychological consultant, completed a PRT (tr. 398-411), finding that the plaintiff had an anxiety disorder that was not severe and opining that he had mild restriction of the activities of daily living, mild difficulties maintaining social functioning, mild difficulties maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. 398, 403, 408.) She also opined that the plaintiff's allegations of depression, anxiety attacks, and memory loss were not fully credible. (Tr. 410.)

On August 6, 2008, the plaintiff underwent MRIs of his cervical and lumbar spine. (Tr. 413-14.) The cervical spine MRI showed spinal alignment and vertebral body heights within normal

---

[4] Ms. Warner did not indicate her degree or professional license on her assessment.

limits and no abnormal signal within the cervical spinal cord, but also showed disc protrusions at C2–3, C3-4, C4-5, C5-6, and C6-7 as well as mild spinal canal stenosis at C4-5, C5-6.  (Tr. 413-14.)  The lumbar spine MRI showed disc dessication, diffuse disc bulging, and spinal canal stenosis at L3-4 and L4-5.  (Tr. 414-15.)  The degree of stenosis was rated as mild at L3-4 and moderate at L4-5, and the MRI also showed evidence of right facet arthropathy at L4-5 and mild disc protrusion at L5-S1.  *Id.*

The plaintiff presented to Spectrum Pain Clinics from August 2008 until October 2009, where his back and neck pain was managed under the care of Dr. John Faccia.  (Tr. 448-505.)  The plaintiff was treated with narcotic pain medication and also underwent a series of sacroiliac joint injections on March 5, April 30, and October 21, 2009 (tr. 448, 466, 472, 515), and cervical branch nerve blocks on September 16, 2008, and June 29, 2009.  (Tr. 460, 489.)

From October 17, 2008, until December 31, 2009, the plaintiff presented to Express Medical, where he was seen by nurse practitioners Susan Gasque, Evelyn Wright, and Melanie Kay Stone.  (Tr. 417-46, 510-13.)  During this time, he presented approximately 1-2 times per month, and the nurse practitioners at Express Medical managed his symptoms, reviewed lab results, and prescribed medications related to hyperlipidemia, hypertension, diabetes, insomnia, muscle pain and spasms, anxiety, cardiac palpitations, COPD, epigastric pain, gastroesophageal reflux disease ("GERD"), and migraine headaches.  *Id.*  He also presented with temporary ailments including sore throat and congestion, bronchitis, left heel pain, and costochondritis.  (Tr. 428, 430, 432-33, 440, 442.)  With a few exceptions related to specific, temporary ailments, physical examinations showed him to have occasional tenderness and spasms in the lumbosacral and cervical paraspinal muscles but negative straight leg raises, deep tendon reflexes 2+ bilaterally, normal pulses, no edema, cranial nerves

"grossly intact without lateralizing weaknesses," and "normal body movement/coordination and mental status." (Tr. 420-21, 423-24, 426, 428, 430, 432-35, 437-38, 440, 442, 444, 446, 511, 513.)

On February 19, 2009, the plaintiff presented with "persistent pain [in his] knees and lower back," and he "[felt] he may need a 'shot' for pain" because his prescription medications were not relieving his pain. (Tr. 437.) Ms. Wright diagnosed him with right knee pain, low back pain, and chronic arthralgia, and she advised him to alternate ice and heat, avoid lifting more than 5-10 pounds, use proper body mechanics when lifting, rest with a gradual increase in activity, and avoid twisting, bending, reaching while lifting, prolonged sitting, and sudden changes in position. *Id.* On March 31, 2009, he had similar complaints of pain and was diagnosed with chronic right knee pain. (Tr. 435.) During a physical examination, he had an antalgic gait and tenderness in his right knee but was able to perform a straight leg raise, cross leg raise, toe walk, heel walk, and squat. *Id.*

On April 2, 2009, the plaintiff completed an application for a disability placard in which Ms. Stone indicated that he was permanently confined to a wheelchair with a permanent disability. (Tr. 419.) Ms. Stone also opined on a May 12, 2009 Request for Medical Information form that the plaintiff was physically or mentally unfit for employment or training for one year. (Tr. 418.)

In August and September 2009, Ms. Stone and Ms. Wright treated him for epigastric pain. (Tr. 420-29, 511-12.) He underwent an esophagogastroduodenoscopy ("EGD"), the results of which were "unremarkable," and he was treated for peptic ulcer disease, GERD, and esophageal polyps. (Tr. 420-24, 511-12.) He returned on December 31, 2009, complaining of congestion and reporting that he had fallen and hurt his back. (Tr. 513.) A physical examination showed muscle soreness in the lumbosacral spinal area, but straight leg raises were negative and he had "[n]ormal body movement/coordination and mental status." *Id.*

On February 24, 2010, Ms. Stone completed a physical RFC assessment, opining that, in an eight-hour workday, the plaintiff could sit one hour, stand one hour, and not walk for a complete hour. (Tr. 507-08.) She opined that he could lift no more than ten pounds and could lift less than five pounds occasionally and ten pounds frequently. (Tr. 507.) She opined that his ability to push and/or pull was limited and that he could never crouch, crawl, or reach; rarely climb, balance, stoop, or kneel; and occasionally grasp. (Tr. 507-08.) She explained that "reaching cause[d] intense pain in [his] neck" and that, while "grasping cause[d] cramps in [his] hands," he was "able to grasp to eat or drink." (Tr. 508.) Ms. Stone also opined that he experienced shortness of breath with temperature extremes and environmental allergens. *Id.*

The plaintiff submitted additional medical records to the Appeals Council after the ALJ's August 25, 2010 decision.[5] (Tr. 5-6, 516-22.) The Appeals Council considered the additional evidence but declined to review the ALJ's decision. (Tr. 1-6.) When the Appeals Council considers new evidence but declines to review a plaintiff's application for benefits on the merits, the Court "cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision." *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) (citing *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993)).

The Court can issue a remand order under sentence six of 42 U.S.C. § 405(g) for the Commissioner to consider the additional evidence only if the plaintiff shows that the evidence is "new" and "material," and he provides "good cause" for failing to include the evidence in the record

---

[5] The additional medical records include: (1) a letter from Dr. Faccia dated September 19, 2010; (2) a letter from Ms. Stone dated October 14, 2010; and (3) medical records from Lifecare Family Services dated September 3, 2010. (Tr. 5-6, 516-22.) The plaintiff also submitted education records and a letter from his mother, Glenda Sears. (Tr. 5-6, 261-62, 267-70.)

prior to the ALJ's decision. 42 U.S.C. § 405(g). *See also Templeton v. Comm'r of Soc. Sec.*, 215 Fed. Appx. 458, 463-64 (6th Cir. Feb. 8, 2007) (citing *Foster v. Halter,* 279 F.3d 348, 357 (6th Cir. 2001)); *Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 490-91 (6th Cir. 2006); *Cline*, 96 F.3d at 148 (citing *Cotton*, 2 F.3d at 695-96); *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988). However, because the plaintiff did not request a sentence six remand, the Court's review is limited to the evidence presented to the ALJ.

### B. Hearing Testimony

At the hearing on July 21, 2010, the plaintiff was represented by counsel, and he and Terry Vander-Molen, a vocational expert ("VE"), testified. (Tr. 39-69.) The plaintiff testified that he had a seventh-grade education, was divorced, and lived with his grown children in a trailer owned by his mother, to whom he paid rent. (Tr. 43.) He indicated that he had a driver's license and was able to drive and that he last worked in August 2006.[6] (Tr. 44.) He said that he worked as a farm worker, farm mechanic, auto salvager, and construction worker. (Tr. 44-45.)

The plaintiff testified that he had experienced back and neck pain since he was a child but that, in 1996, his pain started to get worse. (Tr. 57.) He said that he had a cyst surgically removed from his spine in 1996 but that the surgery did not relieve his pain. (Tr. 56-57.) He related that lifting, carrying, and walking made his neck and back pain worse and that he had numbness in his left foot and hands and occasionally dropped things. (Tr. 57-58.) He testified that he missed work

---

[6] The plaintiff testified that he attempted to return to work one time after August of 2006, but he only lasted a day and a half before "passing out" and needing to go to the hospital. (Tr. 44-45.)

2-3 days per week due to back and neck pain and that he occasionally used a cane, which he acknowledged had not been prescribed to him. (Tr. 58-59.)

The plaintiff testified that he had diabetes, which caused swelling, numbness, and tingling in his extremities, as well as COPD, which caused shortness of breath and lack of energy and resulted in his missing several days of work per week. (Tr. 46, 59-60.) He related that he had pain from fibromyalgia in his neck, shoulders, chest, and legs and that he needed "[a] lot of rest" to relieve this pain. (Tr. 60-61.) He also said that he had muscle spasms, insomnia, memory and concentration problems, abdominal pain, migraine headaches, high blood pressure, severe fatigue, anxiety, and depression. (Tr. 61-62.) He recounted that he took medications for diabetes, high cholesterol, high blood pressure, fibromyalgia, a stomach ulcer, back pain, neck pain, leg pain, heart palpitations, muscle spasms, COPD, poor sleep, and "nerves." (Tr. 47-49.)

The plaintiff described having muscle pain, cramps, and spasms upon exertion and related that he could not walk very far without becoming out of breath. (Tr. 50-51.) He estimated that he could stand, walk, and sit for an hour at a time but was not able to lift twenty pounds without experiencing neck pain. (Tr. 54-55.) He said that he was able to wash dishes and laundry, clean, sweep, vacuum, bathe, dress himself, and change the sheets on his bed. (Tr. 50-51.) He testified that his mother prepared his meals and that he did not shop for food or clothing. *Id.* He said that he watched television but did not have any hobbies or attend church. (Tr. 51.) He explained that he socialized "[v]ery little" because he would get "real nervous around people," become paranoid, and isolate himself. (Tr. 51-52.) He explained that he had always been that way and was able to work in the past only because he did not work around a lot of people. (Tr. 53.) He said that he had not

sought treatment with a mental health care provider for this condition but had taken medicine for it. (Tr. 53.)

The VE classified the plaintiff's past job as a farm worker as medium, semi-skilled work; his past job as an automobile wrecker or salvager as heavy, semi-skilled work; and his past job as a farm equipment mechanic as medium, skilled work. (Tr. 63.) The ALJ asked the VE whether a hypothetical person with the plaintiff's age, education, and work experience would be able to obtain work if, in an eight-hour workday, the person could sit six hours; stand and walk 4-6 hours; lift or carry up to twenty pounds occasionally and ten pounds frequently; push or pull to those weights; occasionally crawl, squat, stoop, bend, or climb; concentrate for extended periods of time; respond appropriately to routine changes in the work environment; perform simple, repetitive tasks; but never be exposed to heights or reaching overhead. (Tr. 63-64.) The VE replied that such a person could not perform the plaintiff's past relevant work but could perform unskilled jobs at the light and sedentary exertional levels such as small parts assembler, courier, and mail clerk. (Tr. 64.)

In response to questioning by the plaintiff's attorney, the VE testified that a person who was restricted to less than sedentary work would not be able to perform these jobs. (Tr. 65.) The VE also testified that a marked limitation of range of motion in the neck, numbness in the hands and feet, or blurry vision could limit the types of jobs available to an individual. (Tr. 65-66.) Finally, the VE testified that numbness and tingling that caused a person to often drop things would restrict someone from performing the identified jobs and that a person with COPD causing shortness of breath with temperature extremes and environmental allergens may not be able to perform the courier position due to seasonal allergies. (Tr. 67.)

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on August 25, 2010. (Tr. 25-34.) Based upon the record, the ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2.    The claimant has not engaged in substantial gainful activity since August 2, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: degenerative disc disease, diabetes mellitus, hypertension and chronic obstructive pulmonary disease (COPD) (20 CFR 404.1520(c) and 416.920(c)). All impairments have been considered under the standard set forth in Stone v. Heckler, 752 F2d, 1099 (5th Cir. 1985).

***

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

***

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he should not be required to reach overhead nor work around moving and dangerous machinery or at unprotected heights.

***

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

***

7.    The claimant was born on June 8, 1965 and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

\* \* \*

11.   The claimant has not been under a disability, as defined in the Social Security Act, from August 2, 2006, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 27-33.)


# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching her conclusion.  42 U.S.C. § 405(g).  *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010).  The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion."  *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388,

389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206 (1938)); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must have shown that he was not engaged in "substantial gainful activity" at the time he sought disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must have shown that he suffered from a severe impairment that met the twelve month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See also Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. 2004). A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S. Ct. 376 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff was not engaging in substantial gainful activity and was suffering from a severe impairment that lasted or was expected to last for a continuous period of at least twelve months, and his impairment met or equaled a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). A plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). A plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a

showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, the plaintiff must have shown that his impairment prevented him from doing his past relevant work. *Id.* A plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, [a plaintiff] bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If a plaintiff fails to carry this burden, he must be denied disability benefits.

Once a plaintiff establishes a *prima facie* case that he is unable to perform his past relevant employment, the burden of production shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment and that such employment exists in significant numbers in the national economy. 20 C.F.R. § 404.1512(g); 68 Fed. Reg. 51153, 51154-55 (Aug. 6, 2003). *See also Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains a plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment did prevent him from doing his past relevant work, if other work existed in significant numbers in the national economy that the

plaintiff could perform, he was not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's claim at step five of the five-step process. At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since his alleged disability onset date. (Tr. 27.) At step two, the ALJ determined that the plaintiff had the following severe impairments: degenerative disc disease, diabetes mellitus, hypertension, and COPD. *Id.* At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 28.) At step four, the ALJ determined that the plaintiff was unable to perform his past relevant work. (Tr. 32.) At step five, the ALJ found that the plaintiff could work as a small parts assembly worker, courier, and mail clerk. (Tr. 32-33.)

**C. The Plaintiff's Assertions of Error**

The plaintiff contends that the ALJ: (1) erred in evaluating the medical opinion evidence; (2) erred in evaluating the plaintiff's credibility and subjective complaints of pain;[7] and (3) erred in relying on the VE's testimony. Docket Entry No. 15-1, at 9-21.

**1. The ALJ did not commit reversible error in assessing the medical opinion evidence.**

The plaintiff argues that the ALJ erred in evaluating "the medical records and opinions" of multiple treating and consultative sources. Docket Entry No. 15-1, at 9-16. Specifically, the plaintiff faults the ALJ's assessment of the medical evidence from Dr. Kevin Maquiling, Dr. Frances Berry-Brown, Dr. Everette Howell, Dr. John Faccia, and nurse practitioners Melanie Stone and Evelyn Wright. *Id.* The plaintiff also argues that the ALJ improperly relied on the opinions of the DDS consultative examiners Dr. Alan Cohen and Ms. Susan Warner. *Id.* at 15-16.

The Regulations provide that the SSA "will evaluate every medical opinion" that it receives. 20 C.F.R. § 404.1527(c). However, every medical opinion is not treated equally, and the Regulations describe three classifications for acceptable medical opinions: (1) nonexamining sources; (2) nontreating sources; and (3) treating sources. A nonexamining source is "a physician, psychologist, or other acceptable medical source[8] who has not examined [the plaintiff] but provides

_____

[7] The plaintiff makes separate arguments that the ALJ "failed to properly apply the Sixth Circuit standard for evaluation of pain" and "made credibility findings which are not based on a full and accurate reading of the record." Docket Entry No. 15-1, at 16-20. The Court will address both of these issues together.

[8] The Regulations define acceptable medical sources as licensed physicians, both medical and osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a).

a medical or other opinion in [the plaintiff's] case." 20 C.F.R. §§ 404.1502, 416.902. A nontreating source is described as "a physician, psychologist, or other acceptable medical source who has examined [the plaintiff] but does not have, or did not have, an ongoing treatment relationship with [the plaintiff]." *Id.* Finally, the Regulations define a treating source as "[the plaintiff's] own physician, psychologist, or other acceptable medical source who provides [the plaintiff], or has provided [the plaintiff], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]." *Id.* An "ongoing treatment relationship" is a relationship with an "acceptable medical source when the medical evidence establishes that [the plaintiff] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the plaintiff's] medical condition(s)." *Id.*

Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating source, as compared to the medical opinion of a non-treating source, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2).[9] *See also Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. 2010); *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009). This is commonly known as the treating physician rule. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996).

---

[9] Effective March 26, 2012, the numbering for the treating physician rules changed. Section 416.927(d)(2) became section 416.927(c)(2), and the identically worded and interpreted section 404.1527(d)(2) became section 404.1527(c)(2). *See Johnson-Hunt v. Comm'r of Soc. Sec.*, 2012 WL 4039752, at *6 n.6 (6th Cir. Sept. 14, 2012).

Even if a treating source's medical opinion is not given controlling weight, it is "'still entitled to deference and *must be weighed using all of the factors provided in [20 C.F.R. 416.927] . . . .*'" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. 2006) (quoting current 20 C.F.R. § 404.1527(c)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (citing current 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2)). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* If an ALJ fails to adhere to this procedural requirement, the case should be remanded for further clarification.[10] *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544-45 (6th Cir. 2004).

---

[10] The rationale for the "good reasons" requirement is to provide the plaintiff with a better understanding of the reasoning behind the decision in his case and to ensure that the ALJ properly applied the treating physician rule. *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

### a. Dr. Maquiling

Dr. Maquiling, a cardiologist, evaluated the plaintiff for angina, hypertension, and peripheral vascular disease from August to November, 2007. (Tr. 310-15, 318-25.) An August 14, 2007 arterial scan showed "no significant . . . arterial disease involving either the right or left lower extremity arterial systems" (tr. 310), and a September 14, 2007 chest x-ray showed "[n]o acute cardiopulmonary pathology." (Tr. 315.) A cardiac catheterization was "consistent with hypertensive heart disease" but showed "normal coronary arteries" and "normal left ventricular function." (Tr. 313, 325.) According to Dr. Maquiling, these findings indicated a possible "nonvascular cause of his symptom pattern such as COPD for the dyspnea and spinal stenosis for the leg pains." *Id.* In a letter dated October 16, 2007, Dr. Maquiling wrote to Dr. Berry-Brown that there was "no sign of obstructive coronary artery disease and no sign of significant peripheral vascular disease within the iliac or proximal portions of the superficial femoral arteries." (Tr. 320.) On November 20, 2007, he wrote to Dr. Berry-Brown that the plaintiff was "doing well" on Atenolol and that he did not recommend any further cardiovascular workup. (Tr. 318.)

It is unclear what conclusion the plaintiff suggests the ALJ should have reached based on this evidence. The ALJ appropriately considered the evidence from Dr. Maquiling and, indeed, included COPD as a severe impairment. (Tr. 27, 30.) However, Dr. Maquiling did not offer any further opinions regarding the plaintiff's functional limitations. The ALJ's review was constrained to the evidence before him, and the Court concludes that the ALJ did not err in assessing the medical evidence from Dr. Maquiling.

### b. Dr. Berry-Brown

Dr. Berry-Brown treated the plaintiff between September 2007 and February 2008, and, during this time, diagnosed him with COPD, shortness of breath, chest pain, hypertension, anxiety, leg pain, hyperlipidemia, cervical arthritis, thoracic arthritis, and low back pain. (Tr. 331-44, 385-90.) On each visit, Dr. Berry-Brown performed a physical and neurological examination, and each examination was within normal limits, including normal range of motion of the spine and extremities, no clubbing or edema, pulses 2+ bilaterally, normal gait, and no gross neurologic abnormalities. (Tr. 334, 337, 340, 343, 386, 390.)

The ALJ appropriately addressed this evidence, noting that Dr. Berry-Brown's examinations belied the need for more aggressive treatment options such as spinal injections. (Tr. 30.) Dr. Berry-Brown did not offer an opinion regarding the plaintiff's functional limitations, and the plaintiff does not specify which of her findings support a finding of disability. Docket Entry No. 15-1, at 9-16. To the extent that the plaintiff argues that the ALJ should have reached a conclusion based upon Dr. Berry-Brown's various diagnoses, the Court notes that a "mere diagnosis . . . says nothing about the severity of the condition." *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988). The Court concludes that the ALJ appropriately considered the medical evidence from Dr. Berry-Brown.

### c. Dr. Howell

On December 13, 2007, the plaintiff presented to Dr. Howell for a neurosurgical consultation and, during a physical examination, exhibited "marked" limitation in his neck range of motion, "diminished" back range of motion, difficulty walking on his heels or toes, hypoactive ankle jerks, and sensory loss in his hands. (Tr. 346-47, 356.) A cervical spine x-ray showed "[m]inimal anterior

cervical spondylosis" and "[n]o abnormal motion with flexion or extension," and a lumbar spine x-ray was unremarkable except for "[l]imited excursion with both flexion and extension." (Tr. 353-54.) On December 17, 2007, Dr. Howell noted that the x-rays showed "decreased range of motion of [the plaintiff's] back and minimal anterior cervical spondylosis." (Tr. 355.) In a letter to Dr. Berry-Brown, Dr. Howell indicated his belief that the plaintiff had "significant lumbar and cervical stenosis and . . . persistent and chronic pain as a result of that." (Tr. 356.) He did not recommend surgery but opined that the plaintiff's "ability to work [was] certainly limited by his pain," that he had "significant back and leg pain" and that he "would not be able to do so [*sic*] type of moderate to heavy activity." *Id.* The ALJ did not discuss Dr. Howell's medical findings and did not assign any weight to the opinions that Dr. Howell expressed in his letter to Dr. Berry-Brown.

Initially, the Court notes that Dr. Howell is not a treating source because he performed only a single consultative examination. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (a single examination of a patient by a doctor does not provide the requisite linear frequency to establish an "ongoing medical treatment relationship"). Because Dr. Howell is not a treating source, the treating physician rule does not apply.

However, the ALJ was nevertheless required to consider Dr. Howell's findings. *See* 20 C.F.R. § 404.1527(c) ("Regardless of its source, [the SSA] will evaluate every medical opinion we receive."). The ALJ's decision does not reflect that he did so. The Sixth Circuit, however, has acknowledged that the failure of an ALJ to mention a treating source's opinion can constitute harmless error in certain instances, including when the ALJ "adopts the opinion of the treating source or makes findings consistent with the opinion." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004). *See also Friend v. Comm'r of Soc. Sec.*, 375 Fed. Appx. 543, 551 (6th Cir. April 28,

2010). This rationale has been extended to situations in which the ALJ neglects to mention the opinion of a consultative physician. *See Dykes ex rel. Brymer v. Barnhart*, 112 Fed. Appx. 463, 468 (6th Cir. Oct. 12, 2004) (noting that, if the failure to discuss a treating source's opinion can constitute harmless error, the failure to discuss a consultative examiner's opinion can also constitute harmless error). *See also Wright v. Astrue*, 2009 WL 1471279, at *3-4 (E.D. Tenn. May 27, 2009).

In this case, the ALJ determined that the plaintiff had the RFC for light work with some additional limitations, and this finding is completely consistent with Dr. Howell's opinion that the plaintiff was unable to perform "moderate to heavy activity." Because the ALJ made findings consistent with Dr. Howell's opinion, the ALJ's failure to specifically mention his opinion is harmless error and further consideration on remand would be unavailing. *See Wilson*, 378 F.3d at 547 (citing *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6, 89 S. Ct. 1426, 22 L. Ed.2d 709 (1969) (Courts are not required to "convert judicial review of agency action into a ping-pong game" where "remand would be an idle and useless formality.")).

### d. Dr. Faccia

The plaintiff presented to Dr. Faccia at Spectrum Pain Clinics from August 2008 until October 2009. (Tr. 448-505.) During this time, he was treated for back and neck pain with narcotic pain medication as well as a series of sacroiliac joint injections and cervical branch nerve blocks. (Tr. 448, 460, 466, 472, 489, 515.) The ALJ found that these injections were not necessary in light of the plaintiff's physical and neurological evaluations. (Tr. 30.) Dr. Faccia did not otherwise provide a medical opinion regarding the plaintiff's functional limitations prior to the ALJ's

decision.[11]  Consequently, the Court concludes that the ALJ appropriately addressed the medical evidence from Dr. Faccia.

### e. Nurse practitioners Wright and Stone

The plaintiff was treated by Ms. Stone and Ms. Wright at Express Medical for a variety of medical issues from approximately October 2008 through December 2009.  (Tr. 417-46, 510-14.) On February 19, and March 31, 2009, after he complained of "persistent pain" in his right knee and lower back, Ms. Wright advised him to avoid lifting more than 5-10 pounds; use "proper body mechanics, bend knees and bring objects close to body prior to lifting;" "[r]est with gradual increase in activity; "[n]o complete bedrest;" "[a]void twisting, bending, reaching while lifting, prolonged sitting or sudden change in positions;" and consider pursuing physical therapy.  (Tr. 435-37.)

On February 24, 2010, Ms. Stone completed a physical RFC assessment and opined that during an eight-hour workday the plaintiff could sit for one hour, stand for one hour, not walk for a whole hour, lift less than ten pounds frequently and five pounds occasionally; and push and/or pull with limitations due to decreased strength in his upper and lower extremities.  (Tr. 507.)  She also opined that he could never crouch, crawl, or reach; rarely climb, balance, stoop, or kneel; and occasionally grasp.  (Tr. 507-08.)  She explained that "reaching cause[d] intense pain in [his] neck" and that, while "grasping cause[d] cramps in [his] hands," he was "able to grasp to eat or drink." (Tr. 508.)  Ms. Stone also opined that he experienced shortness of breath with temperature extremes and environmental allergens.  *Id.*

---

[11] As noted above, Dr. Faccia wrote a letter on September 19, 2010, discussing the plaintiff's treatment at Spectrum Pain Clinics.  (Tr. 516.)  However, because the letter was not submitted until after the ALJ issued his decision, the Court has not considered its contents.  *See* n.5 *infra*.

Under the Regulations, nurse practitioners are not classified as acceptable medical sources but as "other sources."[12] 20 C.F.R. § 404.1513(d). Social Security Ruling ("SSR") 06-03p has noted that:

> [w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file.

Soc. Sec. Rul. 06-03p, 2006 WL 2329939, at *3 (quoted in *Heaberlin v. Astrue*, 2010 WL 1485540, at *4 (E.D. Ky. Apr. 12, 2010)). SSR 06-03p clarified the treatment of "other sources" by explaining that:

> [a]lthough the factors in 20 CFR 404.1527(c) and 416.927(c) explicitly apply only to the evaluation of medical opinions from "acceptable medical sources," these same factors can be applied to opinion evidence from "other sources." These factors represent basic principles that apply to the consideration of all opinions from medical sources who are not "acceptable medical sources" as well as from "other sources," such as teachers and school counselors, who have seen the individual in their professional capacity. These factors include:

---

[12] The Regulations define other sources as:

(1) Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists);
(2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers);
(3) Public and private social welfare agency personnel; and
(4) Other non-medical sources (for example, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy).

20 C.F.R. § 404.1513(d).

• How long the source has known and how frequently the source has seen the individual;

• How consistent the opinion is with other evidence;

• The degree to which the source presents relevant evidence to support an opinion;

• How well the source explains the opinion;

• Whether the source has a specialty or area of expertise related to the individual's impairment(s); and

• Any other factors that tend to support or refute the opinion.

2006 WL 2329939, at *4-5. *See also Roberts v. Astrue*, 2009 WL 1651523, at *7-8 (M.D. Tenn. June 11, 2009) (Wiseman, J.). Finally, SSR 06–03p provides that:

> [s]ince there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

2006 WL 2329939, at *6 (quoted in *Boran ex rel. S.B. v. Astrue,* 2011 WL 6122953, at *13 (N.D. Ohio Nov. 22, 2011). *See also Hatfield v. Astrue*, 2008 WL 2437673, at *3 (E.D. Tenn. June 13, 2008) ("The Sixth Circuit, however, appears to interpret the phrase 'should explain' as indicative of strongly suggesting that the ALJ explain the weight, as opposed to leaving the decision whether to explain to the ALJ's discretion.") (quoted in *Boran*, 2011 WL 6122953, at *13; and *Brandon v. Astrue*, 2010 WL 1444639, at *9 (N.D. Ohio Jan. 27, 2010)).

The Court notes that the ALJ appears to have considered all of the treatment notes from Express Medical as having originated with Ms. Stone even though some of the notes were completed by other nurse practitioners, including Ms. Wright and Ms. Gasque. (Tr. 30-31, 433, 435-43.) Notwithstanding, the ALJ clearly considered the treatment notes from both Ms. Stone and Ms. Wright and, indeed, addressed them in considerable detail. The ALJ found that the plaintiff's visits to Express Medical "were rather routine in nature and did not indicate the need for inpatient hospital care, steroid injections or any extraordinary medical therapy." (Tr. 30.) The ALJ also found that Ms. Stone's RFC assessment was contradicted by her physical and neurological examinations of the plaintiff, which were essentially within normal limits. (Tr. 31.) The ALJ concluded that Ms. Stone's assessment was "unsupported by and inconsistent with the evidence of record" and afforded it "less weight." *Id.*

Unlike Ms. Stone, Ms. Wright did not offer an opinion regarding the plaintiff's functional limitations. The plaintiff points to Ms. Wright's recommendations in a March 31, 2009 treatment note that he avoid certain exertional and postural activities. Docket Entry No. 15-1, at 10-11; (tr. 435-36). However, these recommendations, which Ms. Wright also made on February 19, 2009 (tr. 437), are clearly related to treatment of the plaintiff's isolated complaints of right knee pain and are not opinions regarding the plaintiff's ongoing functional limitations.

The Court concludes that the ALJ appropriately considered the evidence from Ms. Stone and Ms. Wright. Neither nurse practitioner is an acceptable medical source as that term is defined in the Regulations, and only acceptable medical sources can give medical opinions. *See* 20 C.F.R. §§ 404.1513(a),(d); 404.1527(a)(2). Consequently, the ALJ was not required to give their opinions controlling weight as if they were treating sources and only needed to consider their opinions in light

of the factors outlined in SSR 06-03p. *See* 2006 WL 2329939, at *4-5. *See also Roberts*, 2009 WL 1651523, at *7-8. Although the ALJ did not specifically mention Ms. Wright by name, he considered her treatment notes and found that they did not indicate that the plaintiff had a disabling impairment. (Tr. 30.) Similarly, the ALJ found that Ms. Stone's treatment notes did not evidence a disabling impairment and decided to give her opinion little weight because it was not supported by her treatment notes and was inconsistent with the record. (Tr. 30-31.) The Court concludes that the ALJ appropriately considered the medical evidence and opinions from nurse practitioners Stone and Wright.

### f. Non-examining DDS medical consultants

The plaintiff also argues that the ALJ improperly relied on the opinions of the nonexamining DDS medical consultants, Dr. Cohen and Ms. Warner. Docket Entry No. 15-1, at 15-16.

Dr. Cohen opined on January 30, 2008, that the plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk at least two hours in an eight-hour workday; sit about six hours in an eight-hour workday; and had a limited ability to push and/or pull with his lower extremities. (Tr. 375.) He also opined that the plaintiff could frequently kneel, crouch, and crawl; occasionally climb ramps and stairs, balance, and stoop; but could never climb ladders, ropes, or scaffolds. (Tr. 376.) Finally, Dr. Cohen opined that the plaintiff should avoid concentrated exposure to machinery, heights, fumes, odors, dusts, gases, and poor ventilation. (Tr. 378.) Ms. Warner opined on May 23, 2008, that the plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; and push and/or pull without limitations.

(Tr. 393.) She also opined that he should avoid concentrated exposure to fumes, odors, gases, and poor ventilation and that he could never climb ladders, ropes, or scaffolds but could frequently climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. (Tr. 394-95.)

Because the ALJ did not give the treating physicians' opinions controlling weight, the Regulations require the ALJ to explain the weight given to the opinions of the State agency physicians. *See* 20 C.F.R. § 404.1527(e)(2)(ii) ("Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant . . . ."). *See also* SSR 96-6p, 1996 WL 374180, at *1 (An ALJ cannot ignore the findings of fact made by State agency medical and psychological consultants and must explain the weight given to such opinions.).

In this case, the ALJ considered these opinions and, after concluding that they found the plaintiff capable of performing "basic work-related activities," gave them "some" weight. (Tr. 32.) The plaintiff argues that Ms. Warner's opinion was not consistent with the record and that the ALJ's assessment of the plaintiff's RFC conflicts with Dr. Cohen's finding that the plaintiff had a sedentary RFC. Docket Entry No. 15-1, at 15-16. However, the ALJ did not adopt either opinion in total and only credited the State agency physicians' opinions to the extent that they showed the plaintiff capable of performing some level of work. The plaintiff has not shown how this conclusion was in error.

## 2. The ALJ properly applied the Sixth Circuit standard for evaluating subjective complaints of pain and properly evaluated the plaintiff's credibility.

The plaintiff argues that the ALJ "failed to properly apply the Sixth Circuit standard for evaluation of pain." Docket Entry No. 15-1, at 16-18. As a separate issue, the plaintiff argues that

the ALJ "made credibility findings which are not based on a full and accurate reading of the record." *Id.* at 18-20. The Court addresses these issues together.

Because an individual's ability to tolerate pain is specific to that individual, "a determination of disability based on pain by necessity depends largely on the credibility of the [plaintiff]." *Houston v. Sec'y of Health and Human Servs.*, 736 F.2d 365, 367 (6th Cir. 1984). An ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision of credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the [plaintiff] and judge [his] subjective complaints." *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the [plaintiff's] complaints as incredible, he must clearly state his reason for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp. 2d 954, 958 (N.D. Ohio 2003) (citing *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994)).

Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186, at *4. In assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence. *Id.* at *5. Consistency between the plaintiff's subjective complaints and the record evidence "tends to support the credibility of the [plaintiff], while inconsistency, although not necessarily defeating, should have the opposite effect." *Kalmbach v. Comm'r of Soc. Sec.,* 2011 WL 63602, at *11 (6th Cir. Jan. 7, 2011). The ALJ must explain his credibility determination such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reasons for that weight. Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4.

Both the SSA and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. *See* 20 C.F.R. §§ 404.1529; 416.929; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit, in *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[13] The *Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an underlying medical condition. *Felisky*, 35 F.3d at 1039 (quoting *Duncan*, 801 F.2d at 853). The second prong has two parts: "(1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

The ALJ satisfied the first prong of the *Duncan* test when he concluded that the plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms. (Tr. 29.) Given that the second prong of the *Duncan* test consists of two alternatives, the plaintiff must only meet one of the following two elements: the objective medical evidence "confirms the severity of the alleged pain arising from the condition" or the "objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." The SSA provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R. § 404.1529(c). The ALJ cannot ignore a plaintiff's statements detailing the symptoms,

---

[13] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n.2.

persistence, or intensity of his pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. § 404.1529(c)(2). Besides reviewing medical records to address the credibility of a plaintiff's symptoms of pain, an ALJ must review the entire case record in light of the seven factors set forth in 20 C.F.R. § 404.1529(c)(3).[14]

Here, the ALJ set forth a detailed analysis evaluating several factors in 20 C.F.R. § 404.1529(c)(3) and concluded that the plaintiff's subjective complaints of pain were not entirely credible. (Tr. 29-32.) Relying on the plaintiff's testimony and the medical record, the ALJ discussed, *inter alia*, the plaintiff's daily activities; the location, duration, frequency, and intensity of the plaintiff's pain; the plaintiff's treatment history; and several other factors regarding the plaintiff's allegations of pain. *Id.* The plaintiff argues that the ALJ "summarily dismissed the plaintiff's allegations of disabling pain and limitations of daily activities without giving specific reasons for rejecting his testimony." Docket Entry No. 15-1, at 20. Contrary to the plaintiff's contention, however, the ALJ in fact made several highly specific findings explaining why he found the plaintiff's complaints of disabling pain not credible.

Initially, the ALJ noted that, while the plaintiff alleged a disability onset date of August 2, 2006, other than a 1996 "normal x-ray of his cervical spine," he had no medical records between 1996 and July 24, 2007, the latter date being almost a year after his alleged onset date. (Tr. 29.) The

---

[14] The seven factors include: (i) the plaintiff's daily activities; (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms; (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms; (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on his back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) other factors concerning the plaintiff's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

ALJ also noted that, on July 24, 2007, when the plaintiff presented to the emergency room with intermittent chest pain, the emergency room physician observed that the plaintiff offered inconsistent reports regarding the duration and severity of his chest pain and noted that he was "asymptomatic overnight" in the hospital. (Tr. 29-30, 303-04.) The plaintiff underwent a stress echocardiogram that was normal without any evidence of angina, and chest x-rays were also normal. (308-09, 326.) The ALJ also noted that, while the plaintiff complained of back and neck pain, physical and neurological examinations conducted by Dr. Berry-Brown "were essentially within normal limits." (Tr. 30, 334, 337, 340, 343, 386, 390.)

Finally, the ALJ summarized his assessment of the plaintiff's credibility as follows:

> While the claimant has received a considerable amount of medical treatment it has been essentially routine and conservative in nature. The injections which the claimant underwent does [*sic*] not appear to have been justified, given the results of physical examination performed by treating sources as well as the results of x-rays and diagnostic testing of record. The records show that the claimant's hypertension and diabetes remain under good control with prescribed medications. In addition, the claimant has only required occasional and conservative treatment for infrequent symptoms of COPD. Despite the claimant's allegations of disability, his activities of daily living remain virtually unlimited. He testified that he cares for his personal needs independently; performs household chores including doing the dishes, cleaning the house, doing laundry, changing the bed; sweeping and vacuuming. There is no objective evidence of record that the claimant's [*sic*] experiences any disabling side effects from prescribed medications. Also based upon the claimant's sporadic work history, it is reasonable to infer that the claimant lacks the motivation to work. For example, the evidence reflects that, during the last five years the claimant worked between 2002 and 2006 he failed have [*sic*] earnings considered to be substantial gainful activity. Accordingly, the claimant's lack of motivation detracts from his credulity [*sic*].

(Tr. 31.)

The plaintiff argues that nonexamining DDS consultants Dr. Edwards[15] and Dr. Cohen found his complaints to be credible in their respective assessments. However, it is the ALJ's role to evaluate the plaintiff's credibility, and his credibility finding is entitled to deference. *See Buxton v. Halter*, 246 F.3d at 773. The fact that the State agency consultants found the plaintiff's complaints to be credible does not diminish the ALJ's reasoned explanation for why he found the plaintiff not credible. The ALJ complied with *Duncan*, Social Security Ruling 96-7p, and 20 C.F.R. § 404.1529 in evaluating the plaintiff's subjective complaints.

**3. The ALJ properly assessed the VE's testimony.**

Finally, the plaintiff argues that the ALJ's "assessment of the vocational expert's testimony was not supported by substantial evidence." Docket Entry No. 15-1, at 20-21. Specifically, the plaintiff argues that the ALJ's hypothetical question to the VE did not contain all of the plaintiff's alleged limitations. *Id.*

The Regulations allow the ALJ to rely on the testimony of a VE at step five to determine whether the plaintiff is able to perform any work. 20 C.F.R. § 416.960(c). The VE's testimony, in response to the ALJ's hypothetical question, will be considered substantial evidence "only if that [hypothetical] question accurately portrays [the plaintiff's] individual physical and mental

---

[15] Elsewhere in his memorandum, the plaintiff argues that his mental limitations "were not even taken into consideration," citing PRTs completed by Dr. Edwards and Dr. Lawrence. Docket Entry No. 15-1, at 14; (tr. 360-73, 398-411). Although the ALJ did not specifically mention these assessments, his determination that the plaintiff had only mild mental limitations corresponds with the opinions of Drs. Edwards and Lawrence. (Tr. 28, 370, 408.) Consequently, the ALJ did not ignore the plaintiff's mental limitations, and, to the extent that he should have specifically mentioned the opinions of the consultative examiners, any such error was harmless. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004). *See also Dykes ex rel. Brymer v. Barnhart*, 112 Fed. Appx. 463, 468 (6th Cir. Oct. 12, 2004).

impairments." *White v. Comm'r of Soc. Sec.*, 312 Fed. Appx. 779, 785 (6th Cir. Feb. 24, 2009) (quoting *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)). *See also Anderson v. Comm'r of Soc. Sec.*, 2010 WL 5376877, at *3 (6th Cir. Dec. 22, 2010) (citing *Felisky*, 35 F.3d at 1036) ("As long as the VE's testimony is in response to an accurate hypothetical, the ALJ may rely on the VE's testimony to find that the [plaintiff] is able to perform a significant number of jobs."). Although a hypothetical question must accurately portray a plaintiff's impairments, an ALJ "is required to incorporate only those limitations that he accepts as credible." *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 425, 429 (6th Cir. Feb. 9, 2007) (quoting *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

The plaintiff argues that the ALJ should have included specific alleged impairments including chronic neck and back pain, shortness of breath, difficulty walking, numbness and swelling in his hands, and anxiety. Docket Entry No. 15-1, at 21. The plaintiff points out that, when asked how numbness and swelling of the hands that resulted in often dropping things would affect the availability of jobs, the VE testified that a person with such an impairment would be unable to perform the identified jobs. *Id.*; (tr. 66-67). However, as discussed above, the ALJ did not find the plaintiff's complaints fully credible. When formulating the hypothetical question to the VE, the ALJ included only those limitations that he found credible and supported by the evidence. Moreover, some of these limitations, such as difficulty walking and back and neck pain due to degenerative disc disease, are accounted for in the ALJ's formulation of a light RFC for the plaintiff. The ALJ did not err in questioning the VE or in relying on the VE's testimony to conclude that the plaintiff could perform some work.

## IV. RECOMMENDATION

For the above stated reasons it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 15) be DENIED and that the Commissioner's decision be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,


JULIET GRIFFIN
United States Magistrate Judge